UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Alexander M. Novak ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CV 50236 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alexander Novak was found to be disabled shortly after birth, and has been receiving Supplemental Security Income benefits since then.[2] When he reached age 18, as required by Social Security regulations, his eligibility was re-determined under adult standards, and he was found by an administrative law judge ("ALJ") to no longer be disabled. Plaintiff now argues that the ALJ wrongly concluded he could work full-time despite his borderline intellectual functioning and leg problems. As explained below, a remand is required to further develop the record regarding several unresolved issues.

### BACKGROUND

On December 9, 2014, a hearing was held before the ALJ. Plaintiff and his mother were present, but they were not represented by counsel. The ALJ informed plaintiff that he had the right to an attorney who would "only get paid if you win." R. 55. After plaintiff and his mother both answered that plaintiff was willing to go forward without an attorney, the ALJ asked that they sign a waiver and they each did so. *See* Ex. 17B.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] This finding was apparently based on a diagnosis of spina bifida. *See* R. 87, 90.

1

The ALJ then asked whether plaintiff whether he had been given "a CD with [his] file on it." R. 58. When plaintiff's mother answered "yes," the ALJ stated that she "really need[ed] Alex to be answering this." R. 58. Plaintiff stated that they had been given a disk. The ALJ asked whether he or his mother had been able to open it and see the contents. Plaintiff answered "no." *Id.* The ALJ summarized, in very general terms, the type of documents on the disk and asked if plaintiff had any objections to them. Plaintiff answered "no" and the records were admitted into evidence.

After these preliminaries, the ALJ questioned plaintiff, asking first about recent doctor visits. After a few questions, plaintiff's mother started answering the questions. The ALJ eventually asked about a notation stating that when plaintiff was a senior in high school, someone suggested that he talk to a social worker about what to do when he graduated. Plaintiff's mother explained that this visit never happened because the woman "was very firm with [plaintiff] and he kind of [] shut down and he stopped talking to her [] completely." R. 62. Thereafter, the following back and forth then ensued between the ALJ and plaintiff's mother:

> Q    Were you part of those discussions [with the social worker]?
>
> A    Correct. I was.
>
> Q    So what kinds of things was she discussing?
>
> A    She just said he's 18 now and you cannot be in this discussion.
>
> Q    Well she's got a point.
>
> A    I know. It –
>
> Q    So you –
>
> A    He's my baby and –
>
> Q    I know but – he's your baby.

| | | |
|---|---|---|
| A | | Right. Yeah. |
| Q | | He's also a man. |
| A | | I know. I understand that. |
| Q | | And what you as a family need to decide is how's Alex going to function for the rest of his life? Is he going to be on disability for the rest of his life or is he going to try and get some help to figure out if there's some kind of job he could do or not? You know? I mean – |
| A | | I mean – and I understand what you're saying, but I guess you could say I'm one of these overprotective mothers. |
| Q | | Well I understand. If I had a kid with spina bifida, I would be extremely overprotective as well. |
| A | | Just because of all the surgeries he had on his head and – |
| Q | | All right. |
| A | | I mean he almost died on us once so – |
| Q | | But that was a long time ago. |
| A | | I know it was, but he's still – |
| Q | | That was – |
| A | | I know, I'm just overprotective I guess I – |
| Q | | Yeah. And the question as a mom – and I'm not a therapist so I can't pursue this very far, but as a mom, lots of moms have problems with their kids, and our goal as parents is to give our kids the tools they need to function at the greatest level they can. |

R. 62-63.

Plaintiff's mother stated that she let plaintiff take a college auto mechanics course but that he failed the class "because he couldn't understand it." R. 64. This answer prompted the ALJ to ask whether they had talked to anyone in the disabilities office at the college, and the following colloquy ensued:

3

Q  [] Did you talk to the 504 [] office for students with disabilities at the college?

A  McHenry County said that they didn't – the McHenry County College said they didn't have somebody. I don't know if they did, but they told me they didn't have somebody to – with his special needs.

Q  Well but see – I thought, I could be wrong, but I thought every college –

A  I thought the same thing. I thought so too.

Q  -- was required to have an office. What was the name of the college?

A  McHenry County. MCC.

Q  The special needs program at McHenry County College is blah blah blah. They have a special needs office.

A  Well they gave me the wrong information.

Q  I'm just saying. I went there.[3]

A.  I know.

Q  There's a special needs office –

A  Okay.

Q  -- who offers services to students who have a documented learning, physical, psychological –

A  Okay.

Q  -- or other barrier to learning. Every school has it. So obviously – either you didn't ask the right people –

A  Maybe.

Q  -- or they didn't get – you didn't get the right answer.

A  I'm all for what he wants to try, what he wants –

Q  Okay. I'm just saying –

---

[3] It is unclear what the ALJ means by stating that she "went there." It could mean that she was a graduate of this school. But another possibility, based on the previous question, is that she looked up the college's website and was reading it while talking to plaintiff.

  A  Right. And you're –

  Q  -- there's an office there.

  A  -- probably right and I probably didn't --

R. 64-65.

The ALJ next asked plaintiff's mother whether they had considered the state office of vocational rehabilitation. When plaintiff's mother stated "no," the ALJ asked for a piece of paper so she could give her phone numbers and addresses. The ALJ stated that the vocational rehabilitation site "should have referred [plaintiff] to" a program to help him transition from high school to work. R. 66. The ALJ reiterated to plaintiff's mother that "you've got to get Alex [] the help he needs." R. 67. The ALJ further explained as follows:

> And the help would be getting him properly tested as an adult and finding out if he can work, either independently or if needs such close supervision that he can only perform what they call sheltered work. But if he can only perform sheltered work, they have programs – maybe you're familiar with them – at Goodwill [] or the Answer Center. [] Where they take people with special needs who can't perform a job without a lot of support.[] But even if someone can't perform a job on their own, they shouldn't be sitting at home all day. They should be having [] one of those jobs.
>
>     \*  \*  \*
>
> Because if he gets tested and put in one of these programs, then if I don't continue your benefits, he'll be able to establish that either he can work independently and we're right, or that he was tested and can't and you can refile and – you know? If I continue his benefits, it's still useful information. [] Either way. Because you don't want Alex sitting at home [] for the rest of his life.

R. 68-69.

In response to this statement, plaintiff's mother volunteered that plaintiff had worked for a brief period at company called Turtle Wax but was let go "because he couldn't stand a long period of time" because of leg problems. R. 69. The ALJ asked what the doctor had indicated

5

about his legs, and plaintiff's mother stated that they "we were to get him inserts that go in his shoes." R. 69. The ALJ pointed out that they never got the inserts, and the ALJ observed that plaintiff has "been self-limiting, because he's afraid of pushing himself." R. 71. Plaintiff's mother responded as follows:

> His friend paid for him to join a gym with him. But this friend is really – that's like his early Christmas present. So he – the gym is maybe a five-minute walk from us. So he goes to the gym and he has people help him, you know, with his legs and I don't know what – they hang on, you go up and down. He's been going to the gym and trying to straighten out his –

R. 71. The ALJ next questioned plaintiff directly about these gym activities. Plaintiff stated that he went to the gym two to three times a week and worked out his legs and arms. He specifically worked out on a treadmill for 16 minutes, and then did 80 reps on one leg machine and 80 reps on another leg machine. He then worked out his arms, although he did not state what these activities involved. He estimated that he it took an hour or an hour and a half. He stated that he showered after every workout.[4] He stated that he took a cold shower to "loosen up my joints." R. 73. The ALJ responded that a "[h]ot shower would be better than a cold shower." R. 74. This led to a discussion about the merits of a hot versus a cold shower. The ALJ asked for input from the medical and vocational experts. The psychological expert stated, for example, that a hot shower "is a lot more comfortable, too, I'd say." *Id.*

After this digression, the ALJ returned to plaintiff's job at Turtle Wax. Plaintiff stated that he started this job in December 2012 and quit in the middle of January 2013 because he "had to do a lot of squatting, because we had to clean the floors of the cars." R. 75. At the end of the work day, his back hurt and his knees cramped up. After this experience, he looked for simple jobs and found one at Jewel. He had been working there since September (which would mean roughly three months at the time of the hearing). He worked four or five hours three or four days

---
[4] Plaintiff's mother seemed to question this assertion, but she did not get a chance to explain why.

6

a week. R. 76-77 ("I bag, I bring the carts in, and if they need me to [bring] the hand baskets I get the hand baskets."). The ALJ asked whether plaintiff received special supervision. Plaintiff answered: "I do all the [] same as the other baggers but there's people that watch me. Like the [manager], she watches me and the other people." R. 77. Plaintiff testified that he did not think he could do this job full-time because his back and legs would hurt too much from standing. He worked during a busy time in Thanksgiving and his back started hurting from the extra work. The ALJ asked what he did when his back started hurting. He stated that he would lie down and that he was told by his uncle that "taking Advil or like Ibuprofen it's just going to stop working." R. 78. This statement prompted the ALJ to explain why the uncle's advice was wrong. Here again, the ALJ solicited the advice of the psychological expert, asking him which organ (liver versus kidneys) was damaged by taking too much Tylenol. Dr. Carney stated that it was the liver, and the ALJ offered her views on Tylenol dosage, pain tolerance, and related matters. After this explanation, plaintiff's mother stated: "Thank you for explaining that to him." R. 79. Then the questioning of plaintiff ended somewhat abruptly.[5]

The ALJ next called Michael Carney, a psychologist, as an impartial medical expert. The ALJ began by asking the following question: "Cognitively, emotionally, what do we have?" R. 79. Dr. Carney answered as follows:

> Again,[6] the only – there's been no treatment for him psychologically. They just – the comments from the school were that he's very shy and tends to try to give up a little easily and tends to withdraw, slow to trust others. But in terms of diagnosis of impairments that fall under a 12.02, there's some – IQ scores are in the borderline intellectual function area. They're in the kind of high seventies. What was most noticeable or most salient is the low processing speed index. So he does things slower than other people but his actual scores, generally, besides that one are

---

[5] The ending is so abrupt that it raises a question as to whether the transcript is incomplete, but neither side has suggested that there was any problem.
[6] The word "again" at the start of his testimony also raises a question of whether some portion of the testimony was not included in the transcript or whether there as an *ex parte* discussion between the ALJ and Dr. Carney off the record, which, if true, would raise a host of other issues.

7

decent. So that's the most noteworthy of the various subtests and the IQ tests. So when he took the CE test in June of '12, he didn't get an access one diagnosis at all, he just got the borderline intellectual functioning, and again, the processing speed index score really is what dragged his scores down. So his IQ scores generally are – you know, in the high range in the seventies, actually.

R. 79-80. Dr. Carney was asked by the ALJ whether plaintiff met the criteria of Listing 12.02. He answered by stating that plaintiff had mild limitations in activities of daily living and social functioning and moderate limitations in concentration, pace, and persistence. The latter conclusion was based on various tests and teacher comments that plaintiff was "not finishing assignments timely or tending, perhaps, to get frustrated" and "[g]iving up on them." R. 81. In response to the ALJ's comment about plaintiff being able to do simple and routine tasks, Dr. Carney stated the following: "And certainly he can't do paced activity. He's not going to keep up with his peers in terms of doing things [] in a quick fashion." R. 82. In total, Dr. Carney's testimony covered approximately three pages of the transcript.

The ALJ next called the vocational expert. His testimony was also brief. He answered a hypothetical (one essentially matching the ALJ's later RFC formulation), stating that there would be jobs as a hand packager, cafeteria attendant, and mail clerk. He stated that these jobs could not be done if the employee were off task over 20 percent of the time. His testimony also covered approximately three pages of the transcript.

On January 22, 2015, the ALJ found plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: "borderline intellectual functioning; and history of spina bifida and hydrocephalus, status/post successful shunt." R. 24. The ALJ found that plaintiff did not meet either Listing 12.02 or 12.05. The ALJ found that plaintiff had the residual functional capacity ("RFC") to do light work subject to certain restrictions, including that he be "limited to simple, routine and repetitive tasks with no fast-pace or strict production quotas, but he can meet

end of day requirements." R. 27. Throughout the opinion, the ALJ returned repeatedly to the following four assertions that seemed to serve as catch-all explanations for every legal question: (1) plaintiff worked part-time at Jewel bagging groceries; (2) plaintiff worked out at the gym for an hour and a half two to three times a week; (3) plaintiff did other miscellaneous activities—specifically, taking his sister to school, making simple meals in the microwave, cleaning his room, going to the park occasionally, using a computer to talk with friends, and attending church;[7] and (4) plaintiff "responded appropriately and with adequate memory and concentration throughout the hearing." R. 26.

## DISCUSSION

Plaintiff raises four arguments for remand: (1) the ALJ failed to fully develop the record; (2) the ALJ failed to properly evaluate whether he satisfied Listing 12.05; (3) the ALJ erred in the credibility analysis; and (4) the ALJ's mental functional capacity finding lacked substantial support. The Court finds that the first argument, which incorporates much of the other three arguments, requires a remand.

In assessing the failure-to-develop-the-record argument, there is a preliminary issue. Plaintiff argues that waiver of counsel was not valid because the ALJ did not fully inform plaintiff about all the ramifications bearing on this decision. The Government argues that the ALJ both adequately informed plaintiff and also obtained a written waiver. In his reply, plaintiff argues that the written waiver was insufficient because the ALJ did not give plaintiff time to read it and basically told him to sign it. This issue is significant only on the question of who has the burden of proof. However, the Court need not resolve this issue because, even if plaintiff has the burden of proof, the Court finds that the ALJ failed to adequately develop the record.

---

[7] These activities were taken from a written Function Report completed presumably by plaintiff's mother. Ex. 12E.

The ALJ has a duty to develop a full and fair record, and this duty is more exacting if plaintiff is *pro se*. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). This duty requires the ALJ to "scrupulously and conscientiously" probe the relevant facts, and "is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Id.* An ALJ's failure to fulfill this "special duty" is a good reason to remand to allow additional evidence to be developed. *Thompson v. Sullivan*, 933 F.2d 581, 586 (7th Cir. 1991). In *Thompson*, the plaintiff argued that the 32-minute hearing "was too short to develop the record" and that the ALJ's questioning of the plaintiff was "superficial" and failed to address several of his mental problems adequately. *Id.* In remanding, the Seventh Circuit noted that it was important for the ALJ to elicit both favorable and unfavorable facts. In short, "more thorough questioning" of the plaintiff was required. *Id.* at 587. The Seventh Circuit noted that the duty to carefully develop the record is "even greater" when the claimant has a mental impairment. *Id.*

This Court finds that many of the same concerns raised in *Thompson* are present here. Before considering plaintiff's specific arguments, several preliminary points should be noted. First, the hearing lasted 38 minutes, and the transcript is 33 pages. However, these figures are overstated because they mask the fact that side issues ate up a significant chunk of this time. As described above, the ALJ engaged in several digressions, such as the hot-shower-versus-cold-shower debate. Also, the first part of the hearing addressed the waiver-of-counsel issue. Thereafter, the ALJ addressed several issues relating to finding government resources to deal with plaintiff's problems. The bottom line is that the substantive portion of plaintiff's and his mother's testimony covered roughly nine pages out of the 33-page transcript. *See* R. 69-77.

10

Second, this Court is concerned about the effect the ALJ's various editorial comments may have had on plaintiff and his mother. The ALJ repeatedly offered strong opinions, and did so right at the start of the hearing before any testimony was given. Most notably, the ALJ questioned plaintiff's mother about whether she was doing the right thing in seeking disability benefits for her son.[8] The ALJ also several times expressed doubt about the truthfulness of statements plaintiff's mother made, such as her claim that the community college was unable to help her son. Although the ALJ's comments likely were well meaning, they could have inhibited plaintiff and his mother in presenting their case and, in particular, might have made them reluctant to speak up if they believed the ALJ, or the two experts, made any inaccurate or misleading statements.

Third, and relatedly, the ALJ did not take an active role in eliciting testimony from plaintiff and his mother to ensure that, despite their *pro se* status, they were able to fully tell their side of the story. The ALJ never explicitly offered plaintiff or his mother a chance to ask questions of the experts or to discuss any issues not previously addressed other than a brief question at the very end of the hearing when it was clear that everyone was ready to leave. R. 85 ("ALJ: Any other questions or comments? WTN: No. ALJ: Let us go off the record."). The ALJ also, in general, did not ask open-ended questions that might have prompted plaintiff or his mother to offer additional information that may have been reluctant to share. There were, for example, no questions asked about plaintiff's daily activities, even though the ALJ later in the opinion placed great weight on plaintiff's daily activities as described in the written function report from 2012.

---

[8] *See, e.g.,* R. 63 ("what you as a family need to decide is how's Alex going to function for the rest of his life? Is he going to be on disability for the rest of his life or is he going to try and get some help to figure out if there's some kind of job he could do or not?"); *id.* ("lots of moms have problems with their kids, and our goal as parents is to give our kids the tools they need to function at the greatest level"); R. 68 ("even if someone can't perform a job on their own, they shouldn't be sitting at home all day.").

11

Fourth, the plaintiff had a mental impairment that caused him to process information slowly. This problem likely made it more difficult for him to speak up and point out any possible inaccuracies or misleading impressions. It is true that plaintiff's mother was there to assist him, but she was not a lawyer. Moreover, at several points, the ALJ explicitly stated that she wanted hear directly from plaintiff.

With these considerations in mind, the Court turns to the specific issues raised by plaintiff. The two main substantive issues in this appeal (at least, according to plaintiff) are whether he met all the technical requirements of Listing 12.05 and whether the ALJ properly incorporated all of his limitations into the RFC formulation. Plaintiff argues that the ALJ either overlooked or insufficiently analyzed these issues and that these failures stemmed from the ALJ's failure to develop the record. Plaintiff argues that the ALJ should have questioned both the psychological expert, Dr. Carney, and plaintiff himself, more thoroughly about these issues.

**Listing 12.05.** Plaintiff complains that Dr. Carney was never asked to analyze what plaintiff believes is a key issue in this appeal—namely, whether he met Listing 12.05. This listing, which was amended after the ALJ's ruling, contains multiple requirements. The parties here focus on two of them: that the claimant must have deficits in adaptive functioning and must have a full-score IQ between 60 and 70.

As for the first requirement, it is undisputed that Dr. Carney was never asked about, nor explicitly addressed, whether plaintiff had deficits in adaptive functioning. In the opinion, the ALJ also did not explicitly address this requirement. The Government argues, however, that the ALJ *implicitly* analyzed this requirement by noting that plaintiff "worked part time, went to the gym independently, took his sister to school, made simple meals, cleaned his room, used a computer to talk to friends, and attended church." Dkt. #23 at 8. Although it is undeniably true

that the ALJ placed great weight on these facts, mentioning them at almost every turn in the opinion, the problem is that ALJ never explicitly discussed how these facts satisfied the adaptive functioning requirement. Moreover, because neither Dr. Carney nor any other expert gave an opinion about this specific requirement, the ALJ's analysis was not backed by any medical opinion.[9] In sum, the ALJ's analysis of this requirement is incomplete and vague, a problem that could have been avoided if Dr. Carney had been asked directly about it.

As for the second 12.05 requirement at issue, Dr. Carney was never asked about, nor did he discuss, plaintiff's school-administered IQ score of 66. In the written decision, the ALJ concluded that this IQ score should be given "little weight" because it was inconsistent with plaintiff's part-time job, his gym attendance, and his other miscellaneous activities. R. 27. However, because the ALJ never asked Dr. Carney about this score, and because no other expert opined about it, the ALJ's conclusion lacks any medical opinion to support it. In short, the ALJ engaged in a layperson analysis about the validity of an IQ score. In addition, the ALJ's explanation is threadbare. The ALJ merely relied on the same daily activities argument recited continually throughout the opinion. But the ALJ did not explain how plaintiff's ability to do various activities, such as attending church and going to the gym, made his IQ score invalid.

Given the ALJ's heavy reliance on these activities to find this IQ score invalid, the ALJ should have inquired more at the hearing about these activities. Other than a asking a few questions about plaintiff's job at Jewel and his gym activities, the ALJ asked no questions and instead relied on the written function report containing sparse answers. If the ALJ had asked

---

[9] The Government also argues that the ALJ noted that plaintiff had a GPA of 2.435 and was eligible for graduation. Although the ALJ mentioned these facts, the ALJ again did not connect them to the adaptive functioning requirement. As such, the Government's explanation runs afoul of the *Chenery* doctrine. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced"). Moreover, to the extent that the ALJ relied on these facts, the ALJ did not point out contrary evidence. As plaintiff notes, he was taking special education classes and was reading at a fourth grade level, writing at a third grade level, and doing math at a fifth grade level.

about these activities at the hearing, then the record would contain more detailed information about how frequent plaintiff did these various other activities, how long they took, what they involved, and who (if anyone) accompanied plaintiff. If, for example, plaintiff's mother only took him to Church sporadically where he simply sat in a chair for an hour, then this activity would hardly be probative on the critical question whether plaintiff could work full time.[10] In sum, the ALJ's analysis of Listing 12.05 is insufficient, and this failure likely could have been remedied if the ALJ had engaged in a more rigorous questioning of the medical expert and of plaintiff on these and the other requirements of Listing 12.05.

**RFC Limitations.** Plaintiff levels many of the same criticisms at the RFC finding—specifically, that plaintiff be "limited to simple, routine and repetitive tasks with no fast-pace or strict production quotas, but he can meet end of day requirements." R. 27. Plaintiff believes that this formulation failed to include several limitations identified by various doctors (slow processing speed, need for close supervision, lack of persistence, and need for reasonable rest periods) and included one assertion (meeting end-of-day requirements) not supported by any medical opinion. The Court agrees that the ALJ's analysis is muddled on these issues, which is likely a symptom of the undeveloped record.

Plaintiff's main argument focuses on pace. Plaintiff argues the ALJ wrongly found that could meet production quotas in the jobs identified by the vocational expert and did so by ignoring several medical opinions. The ALJ seemed to adopt a compromise position of sorts by agreeing, on the one hand, that plaintiff could not meet any "fast-paced" or "strict" quotas, but then concluding, on the other hand, that plaintiff could meet end-of-day requirements. But this

---

[10] It is important to remember that the critical issue was not whether plaintiff could work part-time—he testified that he was able to do so at least on at one particular job—but whether working full-time for eight hours a day, five days a week, would be too difficult. The ability to walk his sister to school hardly demonstrates the sustained capacity to stand and walk for six out of eight hours.

14

analysis is vague and unsupported by any medical opinion. It is vague because the ALJ did not explain the underlying logic. Presumably, although the Court is not entirely sure, the ALJ is envisioning a tortoise-and-the-hare scenario in which plaintiff would be unable to keep pace consistently throughout the day but could somehow catch up later in the day. If so, there is nothing in the record to suggest that plaintiff, despite his slow processing speed, had unusual bursts of productive energy akin to a college student who pulls an all-nighter to finish a paper.

The ALJ's claim about meeting end-of-day requirements does not appear to have come from any medical opinion. Notably, Dr. Carney at the hearing was not asked about this issue and instead only opined that plaintiff "certainly" could not do "paced activity." R. 82. However, despite this fact, the ALJ gave the impression that Dr. Carney addressed this issue. Specifically, the ALJ stated the following: "Recognizing the evidence on testing of the claimant's slow processing speech, [Dr. Carney] also [testified] that the claimant should have no fast pace or strict production quotas, but *he is able to meet end of day requirements*." R. 30 (emphasis added). This Court can find nothing in Dr. Carney's testimony to support the assertion italicized in the previous sentence. The ALJ's characterization of Dr. Carney's testimony is, therefore, inaccurate. This is yet another reason to remand the case.

Another RFC issue that plaintiff complains about is his alleged need for close supervision on the job and his lack of persistence. Plaintiff notes that these two problems were identified by Dr. Heinrichs, the consultative examiner, but that the ALJ did not account for them in the RFC formulation.[11] Here again, the ALJ did not raise these issues with Dr. Carney at the hearing, but

---

[11] Dr. Heinrich's report states, in pertinent part, the following: "Due to deficits in memory, concentration, verbal comprehension, abstract reasoning and mental processing speed, the claimant's ability to perform work and academic activities without close supervision is limited. His persistence seemed limited. His social interaction was appropriate but marked with shyness. He would likely be able to adapt to the changing expectations of many work environments." R. 345. This quotation paints a more nuanced picture than the one suggested by plaintiff. Dr. Heinrich's hedge that plaintiff's persistence "seemed" limited and his assertion that plaintiff could adapt to changing environments arguably undermine the other conclusions. These issues can be addressed further on remand.

then, in the later written opinion, gave the impression that Dr. Carney had disagreed with Dr. Heinrichs on these points. *See* R. 29-30. However, the Court again finds that the ALJ's characterizations of Dr. Carney's testimony are overstated, if not erroneous.

Also, as discussed in connection with the Listing argument, the ALJ did not ask probing questions about plaintiff's daily activities even though the ALJ relied heavily on these activities in concluding that plaintiff would not have any problems with pace. Perhaps the central fact relied on by the ALJ was plaintiff's part-time work at Jewel (a fact mentioned 11 separate times in the opinion by this Court's count). The ALJ concluded that, based on this work, plaintiff would not need close supervision and could keep up with the pace. However, there are several unresolved questions about this work. Plaintiff's testimony was unclear about whether he received any accommodations or close supervision on this job and also about what specific quotas (if any) he had to follow. Plaintiff, it must be remembered, had a mental impairment and may not have appreciated if any assistance was being given to him behind the scenes. This is another area where the ALJ could have asked more relevant and probing questions to clarify the record and perhaps could have solicited independent information from plaintiff's supervisors to confirm whether he had any problems keeping up.[12]

The Court finds that the above arguments are sufficient to warrant a remand. Given this conclusion, it is unnecessary, and would be unproductive in any event, to further analyze the remaining arguments as they will inevitably be affected by the subsequent hearing and the additional development of the record. In remanding this case, however, the Court is not indicating any opinion about the ultimate outcome. At this point, the record is too undeveloped (it is only 423 pages) to reach any firm conclusions about several issues in this case. Perhaps this

---

[12] In contrast to the ALJ's heavy reliance on plaintiff's part-time work at Jewel, the ALJ never mentioned plaintiff's problems in trying to work Turtle Wax. The ALJ should have acknowledged this similarly situated counter-evidence.

16

is because the evidence is insufficient to find plaintiff was disabled, but any such conclusion would be premature on the current record. The need for further development of the record is bolstered by the ALJ's own commentary during the hearing when she *sua sponte* observed that plaintiff should be "properly tested as an adult" to see if he is disabled. R. 68. This Court agrees, and remands this case so that such testing (or other measures as deemed necessary) may be done and so that a decision can then be rendered on a more fully developed record. This result is especially appropriate given plaintiff's young age and the large stakes involved for both sides.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: March 29, 2017   By: _____
                           Iain D. Johnston
                           United States Magistrate Judge